ALLIANCE TOWERS, LTD., APPELLANT, *v.* STARK COUNTY BOARD OF REVISION ET AL., APPELLEES.

SUNSET SQUARE, LTD., APPELLEE, *v.* MIAMI COUNTY BOARD OF REVISION ET AL., APPELLANTS. (TWO CASES.)

MURRAY COMMONS, LTD., APPELLANT, *v.* FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES.

STAUNTON COMMONS II, LTD., APPELLANT, *v.* MIAMI COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as Alliance Towers, Ltd. *v.* Stark Cty. Bd. of Revision (1988), 37 Ohio St. 3d 16.]

(Nos. 86-783, 86-810 and 87-2, 86-935 and 86-1069—Submitted October 14, 1987—Decided May 25, 1988.)

*Fred Siegel Co., L.P.A., Fred Siegel, Wayne E. Petkovic* and *Karen Bauernschmidt,* for appellants, Alliance Towers, Ltd., Murray Commons, Ltd., and Staunton Commons II, Ltd., and for appellee Sunset Square, Ltd.

*Robert D. Horowitz,* prosecuting attorney, *John B. Wirtz* and *Gary D. Cerrone,* for appellee Stark County Board of Revision et al.

*Teaford, Rich, Belskis, Coffman &*

*Wheeler* and *Jeffrey A. Rich,* for appellant and appellee, Miami County Board of Revision et al., for appellee, South-Western City Schools Board of Education, and urging affirmance for *amici curiae,* Miami County Auditor and Miami County Board of Revision in case No. 86-783.

*Michael Miller,* prosecuting attorney, and *James R. Gorry,* for appellee Franklin County Board of Revision et al.

MOYER, C.J. These appeals present us with the opportunity to clarify the test to be used to determine the true value of federally subsidized housing under R.C. 5713.03.[4] For the rea-

---

[4] The thrust of the HUD assistance program is to provide safe, sanitary, and decent housing for elderly and low-income people. Sections 880.101 and 885.1, Title 24, C.F.R. The properties under review are privately owned, provide limited distributions to the developer, and are built for elderly people.

The process of building these complexes begins with the filing of an application by a developer with HUD in which the developer forecasts the replacement cost of the building, proposed contract rent, and the projected expenses necessary to operate the apartment project. Sections 880.305 and 880.308, Title 24, C.F.R. "Contract rent" is the total amount of rent specified in the Housing Assistance Payment Contract. It is comprised of the rent paid by the tenant (a percentage of his or her income) and the housing assistance payment. Section 880.201, Title 24, C.F.R. Contract rent depends on the cost of constructing the project, the projected expenses necessary to operate the project, and debt service. Sections 880.308, 880.309, 880.311 and 880.405, Title 24, C.F.R.

If HUD approves the developer's proposal, such approval includes HUD's issuance of mortgage insurance to the lender and a determination of the rent that will be necessary to build and operate the project.

Section 880.309, Title 24, C.F.R. and Section 1715*l*(d)(4), Title 12, U.S. Code. The contract rent plus a utility allowance may exceed what HUD has already determined to be the "fair market rent" (rents including utilities and housing services necessary to attract private development) by as much as twenty percent. Sections 880.203 and 880.204, Title 24, C.F.R. The cost of construction tends to be higher than the cost of a conventional apartment complex due to the extra features required by the minimum property standards (Section 880.207, Title 24, C.F.R.), and the payment of Davis-Bacon wage rates (Aug. 30, 1935), 49 Stat. 1011, to the construction workers. Section 880.210(d), Title 24, C.F.R.

When the project is ready for occupancy, a tenant will pay, as rent, a percentage of his or her income not to exceed thirty percent. Section 813.107, Title 24, C.F.R. As stated, tenant rent and the housing assistance payment, or subsidy, equal "contract rent." This "contract rent" is available to the developer in order to pay the mortgage and expenses. In the cases under review, the evidence indicates that the rents generally available in the market for comparable units were below the "contract rent."

In exchange for financing and subsidy concessions, the developer must accept a regulatory agreement which embodies the

sons set forth below, we conclude that the decision of the BTA in each case is unreasonable and unlawful.

State, ex rel. Park Investment Co., v. Bd. of Tax Appeals (1964), 175 Ohio St. 410, 412, 25 O.O. 2d 432, 433-434, 195 N.E. 2d 908, 910, states the definition of true value of real property as follows:

"In the last analysis the value or true value in money of any property is the amount for which that property would sell on the open market by a willing seller to a willing buyer. In essence, the value of property is the amount of money for which it may be exchanged, i.e., the sale price.

"* * *

"Therefore, the value, or true value in money of property for the purpose of taxation, is the amount which should result from a sale of such property on the open market."

Paragraph two of the syllabus of In re Estate of Sears (1961), 172 Ohio St. 443, 17 O.O. 2d 417, 178 N.E. 2d 240, cited in Park and also quoted in fn. 4 of Cardinal Federal S. & L. Assn. v. Bd. of Revision (1975), 44 Ohio St. 2d 13, 73 O.O. 2d 83, 336 N.E. 2d 433, states:

"Market value is the fair and reasonable cash price which can be obtained in the open market, not at forced sale or under peculiar circumstances but at voluntary sale between persons who are not under any compulsion or pressure of circumstances and who are free to act; or, in other words, between one who is willing to sell but not compelled to do so and one who is willing to buy but not compelled to do so."

This definition of market value is consistent with the definition adopted by the American Institute of Real Estate Appraisers in The Appraisal of Real Estate (8 Ed. 1983) 33, and contained in The Dictionary of Real Estate Appraisal, American Institute of Real Estate Appraisers (1984) 195:

"The most probable price in cash, in terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with a buyer and seller each acting prudently, knowledgeably, and for self interest, and assuming that neither is under undue duress."

A review of the five cases before us reveals a basic difference in the approaches used by the appraisers. The definition of true value is premised upon an open, competitive market. The appraisers here are at odds because they did not all embrace this premise.

---

management requirements contained in Section 880.601 et seq., Title 24, C.F.R., and which controls to whom and under what conditions an apartment may be rented. The developer is permitted to earn an annual limited distribution, that, in these cases, is limited to six percent of his equity or initial investment. Sections 880.205(b)(1) and (c), Title 24, C.F.R. If there is insufficient income to cover debt service and expenses, the developer is still obliged to pay these items. Sections 880.103(d), 231.251, and 207.255, Title 24, C.F.R. If there is an excess of income over debt service, expenses, reserve requirements, and limited distributions, that excess goes into a trust fund managed by the mortgagee. Sections 880.205(d) and 880.601(e), Title 24, C.F.R. This fund is used to enhance the property or reduce rents. Sections 880.205(e) and 880.601(e), Title 24, C.F.R. Previous losses can usually be made up from this trust fund. Section 880.205(d), Title 24, C.F.R. The primary reason for investing in such subsidized housing projects is the favorable after-tax cash flow generated by the accelerated depreciation permitted under the Economic Recovery Tax Act of 1981. Pub. L. 97-34 (Aug. 13, 1981), 95 Stat. 172 (Section 1 et seq., Title 26, U.S. Code).

The taxpayers' appraisers valued the property free and clear of any encumbrance,[5] whereas the appraisers for the taxing authorities presented values of the properties as encumbered by the mortgages and restrictions imposed by the agreements with the federal government. The BTA adopted values which were somewhere between the extremes of the estimates presented by the appraisers and failed to fully express a rationale for its diverse decisions, except in *Murray Commons* where it adopted the supposed mortgage balance as the true value.

This court has approved factual decisions of the BTA in which it did not set forth an analysis of the evidence. *Fair Store Co. v. Bd. of Revision of Hamilton Cty.* (1945), 145 Ohio St. 231, 30 O.O. 454, 61 N.E. 2d 209; *Bd. of Revision of Cuyahoga Cty. v. Fodor* (1968), 15 Ohio St. 2d 52, 44 O.O. 2d 30, 239 N.E. 2d 25. But, where we found that the BTA's decision was not supported by the evidence or by the law, we reversed the board's decision as unreasonable or unlawful. *Cleveland Trust Co. v. Bd. of Revision* (1955), 163 Ohio St. 579, 57 O.O. 9, 127 N.E. 2d 748; *Shaker Square Co. v. Bd. of Revision* (1960), 170 Ohio St. 369, 11 O.O. 2d 75, 165 N.E. 2d 431; *Conalco v. Bd. of Revision* (1977), 50 Ohio St. 2d 129, 4 O.O. 3d 309, 363 N.E. 2d 722.

The apartment buildings herein were constructed at a cost greater than could be justified by market rents. This excessive construction cost was paid with loans insured by the federal government and secured by mortgages, some of which had below-market interest rates. Thus, without the government subsidies, the developer would not have had sufficient rental income under conventional market conditions to repay the mortgage.

In *Canton Towers, Ltd. v. Bd. of Revision* (1983), 3 Ohio St. 3d 4, 3 OBR 302, 444 N.E. 2d 1027, a case concerning a property encumbered similarly as those in the cases *sub judice,* this court affirmed the BTA's determination of true value based upon economic rent and current returns on mortgages according to the income approach to valuation. We upheld the BTA's decision rejecting the use of the actual construction costs for the property since, in the view of both appraisers, the property existed only due to the FHA's willingness to underwrite the construction loans, and, "[w]ithout a federal loan guarantee, favorable mortgage terms, rent subsidy, and income tax advantages, the cost of construction for such housing would be prohibitively expensive." *Id.* at 7, 3 OBR at 304-305, 444 N.E. 2d at 1030. We cited *Wynwood Apartments, Inc. v. Bd. of Revision* (1979), 59 Ohio St. 2d 34, 13 O.O. 3d 19, 391 N.E. 2d 346, for the proposition that the BTA may consider economic rental value of commercial real property as an indicium of value for *ad valorem* real property taxation purposes.

In *Wynwood,* the contract rent for a commercial property was lower than the economic rent. The owner was required, thus, to pay real estate taxes based upon a value higher than what would be indicated using contract rent. Since the BTA did not state that it

---

[5] Black's Law Dictionary (5 Ed. 1979) 473, defines "encumbrance" as:

"Any right to, or interest in, land which may subsist in another to diminution of its value, but consistent with the passing of the fee. *Knudson v. Weeks,* D.C. Okl. [1975], 394 F. Supp. 963, 976 [*sic* 978]. A claim, lien, charge, or liability attached to and binding real property; *e.g.* a mortgage; judgment lien; mechanics' lien; lease; security interest; easement or right of way; accrued and unpaid taxes."

would ignore contract rent, this court affirmed the decision because it was supported by evidence of record.

Ohio court decisions in eminent domain cases parallel these tax decisions. Indeed, the definition of market value contained in *In re Estate of Sears, supra,* is a direct quotation from the eminent domain case of *Cincinnati v. Eversman* (1904), 4 Ohio Law Rep. 140, 53 W.L.B. 476. *Sears,* in adopting this definition of "market value," stresses that the fee simple estate is to be valued free of any restriction or limitation upon the title to the property. After the value is determined on this unencumbered basis, the value awarded is to be apportioned among the various owners according to their interests. *Sowers v. Schaeffer* (1949), 152 Ohio St. 65, 39 O.O. 383, 87 N.E. 2d 257, and (1951), 155 Ohio St. 454, 44 O.O. 419, 99 N.E. 2d 313; *Bd. of Cty. Commrs. v. Thormyer* (1959), 169 Ohio St. 291, 8 O.O. 2d 294, 159 N.E. 2d 612. We have also held that only evidence of the reasonable rental value of property is competent and that evidence of the outstanding leasehold interest is incompetent, even if this interest may be very valuable. *Queen City Realty Co. v. Linzell* (1957), 166 Ohio St. 249, 2 O.O. 2d 82, 141 N.E. 2d 219. See, also, *Schottenstein v. Bd. of Revision of Franklin Cty.* (Dec. 29, 1977), Franklin App. Nos. 77AP-713 and 77AP-714, unreported; and *Zell v. Franklin Cty. Bd. of Revision* (Aug. 26, 1986), Franklin App. No. 86AP-153, unreported.

These tax and eminent domain cases demonstrate the decision by this court to view the fair market value of real property as uncomplicated by encumbrances. It is the fair market value of the property in its unrestricted form of title which is to be valued. It is to be valued free of the ownerships of lesser estates such as leasehold interests, deed restrictions, and restrictive contracts with the government. For real property tax purposes, the fee simple estate is to be valued as if it were unencumbered.

We do not retreat from our decision in *Canton Towers, Ltd. v. Bd. of Revision, supra.* We observed in *Canton Towers* that the actual cost of construction, the "controlled" contract rent, and the actual mortgage rate did not indicate the true value of the property. We noted further that the federal loan guarantees, the favorable mortgage terms, the rent subsidies, and the income tax advantages allowed the project to be built in an area which would not support market rents high enough to make the construction of the apartments feasible. Today, market rents still do not support the cost of constructing these projects.

Tax shelter advantages existed then and now. As the county's appraiser in *Sunset Square* testified, federal tax laws may have changed since *Canton Towers* so that the tax shelter advantages are now transferable. These intangible items do not make the real estate more valuable.

This appraiser further testified that these properties usually sell for prices higher than the mortgage. This is because the government is willing to provide the subsidy to pay the debt service. A competently managed apartment project will support the mortgage and expense payments. In such a case, the terms of the assumption of the mortgage would not seem to have any effect upon the value of the property.

The contract rents, which are a combination of the amount paid by the tenant and the amount paid by the government, are artificially derived without any direct relation to the market. The fee simple estate is not enhanced by the above-market rents because the

owner does not keep this total rent as profit; he receives only a limited distribution and after-tax benefits. Section 880.205(c), Title 24, C.F.R. In sum, the artificial effects of the government housing assistance program are not indicative of the valuation of the real estate.

In the instant cases, the data underlying the mortgage/sale ratio presented by the county's appraiser in *Sunset Square, Murray Commons* and *Staunton Commons II* included mortgage loans for the comparable properties with interest rates of one percent, which rates are below the market rate. As we observed in *Ratner* v. *Stark Cty. Bd. of Revision* (1986), 23 Ohio St. 3d 59, 23 OBR 192, 491 N.E. 2d 680, and (1988), 35 Ohio St. 3d 26, 517 N.E. 2d 915, there may be an amount paid for real estate and an amount paid for favorable financing. The witness did nothing in these cases to ascertain the respective amounts. The Michigan Supreme Court, in *Antisdale* v. *Galesburg* (1984), 420 Mich. 265, 362 N.W. 2d 632, considered a similar mortgage/sale ratio pertaining to the valuation of subsidized apartments and reasoned that the mortgage payments could be made by investing an amount much less than the mortgage balance at a higher, market rate of interest. The assumption of the below-market mortgage did not accurately indicate the fair market value of the properties transferred.

The BTA should not adopt a valuation based upon this unadjusted mortgage/sale ratio. This analysis, which seemed to be a major factor in the county's appraisal reports in *Sunset Square, Murray Commons* and *Staunton Commons II,* should be carefully analyzed to ensure that the properties are truly comparable and the terms of the transfers are satisfactorily adjusted.

The reversion/shelter analyses presented by the county's appraiser in *Sunset Square, Murray Commons* and *Staunton Commons II* were neither exclusively adopted by the appraiser as a method of analysis nor fully endorsed by the BTA. The BTA rejected these analyses as shown by its valuations falling between the two competing opinions or by its acceptance of the supposed mortgage balance. In *Sunset Square,* the BTA found the analysis to be "deflated, inflated or otherwise distorted." These analyses offer no support for the appraiser's conclusions.

We also determine that the analysis by the county's appraiser in the *Alliance Towers* case is similarly flawed by its reliance upon the federal subsidy considerations.

We find nothing in the evidence to cause a departure from *Canton Towers, Ltd.* v. *Stark Cty. Bd. of Revision, supra.* Market rent and current returns on mortgages and equities are as proper to consider in the instant cases as they were in that case, especially when the evidence to the contrary is so distorted. An apartment property built and operated under the auspices of HUD is to be valued, for real property tax purposes, with due regard for market rent and current returns on mortgages and equities.

Further, we hold the decision of the BTA in the first *Sunset Square* case (No. 86-810) is unreasonable and unlawful for a second reason. Upon reconsideration, the BTA stated no specific reasons for reversing its initial valuation that had adopted the valuation of the county's appraiser. It decided, in its later decision, to adopt a value closer to that given by the taxpayer's appraiser.

The BTA has control of its decisions until an appeal is actually instituted to this court or the time for ap-

peal has expired (*National Tube Co.* v. *Ayres* [1949], 152 Ohio St. 255, 40 O.O. 312, 89 N.E. 2d 129), and it may investigate a case beyond the record and pleadings filed with it (*Pennsylvania Rd. Co.* v. *Porterfield* [1971], 25 Ohio St. 2d 223, 54 O.O. 2d 357, 267 N.E. 2d 792). Just as its initial decision must be supported by evidence of record, so must its decision upon reconsideration. It is not enough for the BTA to simply state that its additional study of other court decisions, treatises, trade articles, and books compels a conclusion that the calculations of the witness were "deflated, inflated or otherwise distorted." *Cleveland Pub. Library* v. *Cuyahoga Cty. Budget Comm.* (1986), 28 Ohio St. 3d 390, 28 OBR 448, 504 N.E. 2d 421.

Finally, the taxpayers argue that they were denied due process because each board of revision had, as a member, the county auditor, whose initial valuation of the property was the topic of the inquiry.[6] In the *Alliance Towers* case, the taxpayer additionally argues that the board of revision hired the witness and provided him with specific instructions for the report which he was to submit to the board.

The taxpayers offered no testimony or evidence that the action of the board of revision was not performed in good faith and in the exercise of sound judgment. Absent this proof, the action of the board of revision must be presumed to be valid. See *Wheeling Steel Corp.* v. *Evatt* (1944), 143 Ohio St. 71, 28 O.O. 21, 54 N.E. 2d 132; *Hatchadorian* v. *Lindley* (1986), 21 Ohio St. 3d 66, 21 OBR 365, 488 N.E. 2d 145.

Moreover, the statutory scheme provides for this administrative review to be conducted by the board of revision. R.C. 5715.19. The BTA or the court of common pleas is to hear the case *de novo* and may consider facts additional to those considered by the board of revision. R.C. 5717.01 and 5717.05. Much as in an appeal from the Tax Commissioner, the board of revision is usually designated as a party opponent. While the decision of the board of revision should not be colored with partiality, the General Assembly recognized the possible conflict inherent in the roles of the board members as officials who conduct the affairs of the county, and provided for an appeal to the BTA or the court of common pleas.

In *Alliance Towers* it appears that counsel for the board of revision requested the appraiser to investigate the valuation of the property on a subsidized and an unsubsidized basis. The board of revision directed the appraiser only to prepare a report for its hearing. We find nothing improper in these activities.

For the reasons stated above, the decisions of the BTA are reversed and the cases are remanded to it for reconsideration in accordance with this opinion.

*Decisions reversed and causes remanded.*

Nos. 86-783, 86-935 and 86-1069

HOLMES and WRIGHT, JJ., concur.

LOCHER, J., concurs in the syllabus and judgment only.

---

[6] In *Sunset Square,* the taxpayer did not file a notice of appeal and, thus, did not assert any error. This court may not entertain this error in relation to this case. *Rowland* v. *Collins* (1976), 48 Ohio St. 2d 311, 2 O.O. 3d 450, 358 N.E. 2d 582; *Columbus Bd. of Edn.* v. *J.C. Penney Properties, Inc.* (1984), 11 Ohio St. 3d 203, 11 OBR 521, 465 N.E. 2d 48.

26

SWEENEY, DOUGLAS and H. BROWN, JJ., dissent.

Nos. 86-810 and 87-2

HOLMES and WRIGHT, JJ., concur.

LOCHER, J., concurs in the syllabus and judgment only.

SWEENEY, DOUGLAS and H. BROWN, JJ., concur in judgment only.

