**DAY LAY EGG FARM, Appellee,**

v.

**UNION COUNTY BOARD OF REVISION, Appellant.**

[Cite as *Day Lay Egg Farm v. Union Cty. Bd. of Revision* (1989), 62 Ohio App.3d 555.]

Court of Appeals of Ohio,
Union County.

No. 14–87–18.

Decided April 18, 1989.

*Eisnaugle, Gleaves & Graham Co., L.P.A.,* and *R. William Eisnaugle,* for appellee.

*R. Larry Schneider,* prosecuting attorney, and *John C. Heinkel,* for appellant.

J. THOMAS GUERNSEY, Judge.

This is an appeal pursuant to the provisions of R.C. 5717.04 by the Union County Board of Revision from a decision of the Board of Tax Appeals, hereafter "BTA," in an appeal thereto by the taxpayer, Day Lay Egg Farm, a partnership, from determinations by the board of revision of the true value as of January 1, 1982, of three egg farms owned by the taxpayer situated in Union County.

As the taxpayer, in the hearing before the Board of Tax Appeals, conceded the correctness of all valuations asserted by the board of revision and affirmed by BTA, except the valuations pertaining to egg laying houses located on the respective farms, and the taxpayer has not appealed from BTA's decision as to any of the valuations, except as hereinafter discussed under the third assignment of error, this appeal involves solely the valuations of the egg laying houses.

It is undisputed that each of the three egg farms has on it four egg laying houses with the twelve houses having an overall capacity of 1,200,000 laying hens, or birds. The laying houses on the first farm were constructed in 1978 and each is sixty-five feet wide by three hundred forty feet long. Those on the second farm were constructed in 1979 and are the same size as those on the first farm. Those on the third farm were constructed in 1980 and are

sixty-five feet wide by four hundred feet long. The first two farms each have a total capacity of 380,000 birds, whereas the third farm has a total capacity of 440,000 birds. All of the buildings when constructed were "state of the art" for the industry, described as high rise buildings consisting of a lower level, or manure pit, with concrete floor and walls above which on the second level, supported by concrete columns on the first level, were located cages for the birds, the laying level having a metal roof and metal siding, with some insulation, with fans on either side of each building providing air circulation. Provision was also made for the automatic collection of eggs. The taxpayer's witnesses also testified, without dispute, that these buildings were, when finished, overbuilt for the industry, and that single level buildings, at lesser cost, were being built at the time of the BTA hearing in 1986.

Although reference must be made to the evidentiary transcript of the proceedings before the BTA for the evidence in detail, and to the decision of BTA for the evidence which it specifically relied upon, in summary, the witnesses for the taxpayer, being the taxpayer's general manager and a certified public accountant, both fully familiar with the industry, testified that a recognized standard existed in the industry which equated the value of buildings to the number of birds housed by the buildings. Each testified as to being familiar with a sale in 1985 of a 280,000 bird egg plant, "Heartland," in an adjoining county, for $395,000.00, *i.e.*, $1.41 per bird. The taxpayer's general manager testified that he had offered $1.00 per bird for that plant, which offer was declined, and an amount for which he would not sell any of the plants which he managed, and the accountant testified that the price paid for Heartland was fair at the time of closing, that the Heartland facilities and the taxpayer's facilities were so similar that the sale of one would indicate the value of the other, and that he would conclude that the value of the taxpayer's laying houses for 1982 would be $1.50 per bird multiplied by the capacity of each plant.

The board of revision called only one witness before the BTA, specifically a Mr. Hunt, generally qualified as an expert appraiser. His knowledge of the egg business was minimal, and lacking knowledge of comparable sales to determine market value, and deciding that the income approach was not relevant, he had approached his appraisal, made for the board of revision, in a somewhat mechanical fashion, based entirely on a cost approach. He determined cost by comparing the size and description of the laying houses, which information he had, with pictures and data for what he considered comparable houses in a "Marshall–Swift" national index of building costs. Factoring a resultant construction figure, he then depreciated it at a four percent per year rate (twenty-five year, straight line). Notwithstanding, this witness conceded that a twenty year life would have been reasonable, and further conceded that

he would have considered the Heartland sale in a market data analysis, but the sale was concluded after his appraisal of the taxpayer's properties.

Based on the evidence set forth in its decision and order, BTA summarized and concluded:

"Mr. Hunt's appraisal may be the correct procedure for the application of the cost approach but we are not convinced that it accurately indicates the true value in money of the subject property. The evidence shows that the market price of an egg farm bears a direct relation to its bird capacity.

"Heartland sold for $1.41 per bird. Appellant [taxpayer] argues that Day Lay would sell for $1.50 per bird. The difference would account for Day Lay's overall superiority. This proposal is supported by the evidence and we find it to be reasonable. Added to the value based on the above would be the values for other facilities and land that were stipulated."

Since the cost values for the buildings other than the laying houses were stipulated for 1985, these values had to be depreciated to reflect 1982 cost values, to which were then added the $1.50 per bird 1982 true value of the laying houses and the value of land to arrive at the final true value figures for land and buildings from which the board of revision has appealed.

The appellant board of revision assigns error of BTA as follows:

"1. In admitting, considering, and relying upon inadmissible hearsay testimony in rendering their decision for appellee taxpayer.

"2. In admitting or considering opinion evidence of the taxpayer's certified public accountant, contrary to Evid.R. 703 and *State v. Jones* (1984), 9 Ohio St.3d 123 [9 OBR 347, 459 N.E.2d 526 (1984)].

"3. In applying a twenty year depreciation rate to the subject property.

"4. In that its decision was against the manifest weight of the evidence and must be reversed."

As we are of the opinion that the third assignment of error is not portrayed by the record we will first dispose of it separately before we proceed to dispose of the remaining assignments of error together.

Appellant's premise is that the BTA applied a twenty year depreciation rate to the property. Reference to the next to the last page of the BTA decision discloses that depreciation was applied only to the structures on each farm other than the laying houses. No depreciation was applied to the $1.50 per bird value of the laying houses, but that $1.50 per bird value was accepted and adopted as being the true value of each and all of the laying houses as of January 1, 1982, regardless of when they had been constructed and regardless of possible differences in their condition, or the existence of, or differences in, actual depreciation. The values of the structures to which depreciation was

applied, specifically the "offices" and "feed mill" on the farms, had been stipulated to by the taxpayer as being those values determined by the appellant's appraiser as being the 1985 cost value. The BTA then reduced those values to 1982 cost values. Mathematical computation discloses that the 1982 cost value of those structures at each plant was then reduced by depreciation which in each case was at the rate of four percent of 1982 cost value for each year prior to 1982, including the year of construction. Thus those four-year-old structures at plant 1 were reduced by depreciation of sixteen percent; those three-year-old structures at plant 2 were reduced by depreciation of twelve percent; and those two-year-old structures at plant 3 were reduced by depreciation of eight percent; thus, straight line depreciation of four percent per year based on a life of twenty-five years is appropriate rather than a twenty-year depreciation of five percent per year as asserted by the appellant. Accordingly, the appellant's claim of error is not portrayed by the record and, for that reason alone, is found not well taken.

We then proceed to consider the remaining assignments of error together.

■ In its argument of the remaining assignments of error appellant board of revision relies strongly on the Ohio Rules of Evidence adopted by the Supreme Court effective July 1, 1980, or upon decisions in civil and criminal cases decided prior thereto. In our opinion such reliance is misplaced. Evid.R. 101(A) specifically provides:

"(A) *Applicability.* These rules govern proceedings *in the courts of this state* and before court-appointed referees and magistrates of this state, subject to the exceptions stated in division (C) of this rule." (Emphasis added.)

Subdivision (C) does not prescribe any applicability of these rules of evidence to proceedings before the BTA. Examination of the rules adopted by the BTA appearing in the Ohio Administrative Code does not disclose that that body had adopted the Ohio Rules of Evidence either by reference or otherwise, nor have we found that it has adopted other formal rules of evidence for any of its proceedings. Neither do we find any of the statutes in R.C. Chapter 5717 holding it to any particular rules of evidence in its proceedings, nor have we been able to find in any of the Supreme Court decisions dealing with its proceedings where the Supreme Court has reversed any decision of the BTA grounded on the *admissibility* of hearsay and/or opinion evidence.

Judge Brogan of the Second District Court of Appeals states in his opinion in *Haley v. Ohio State Dental Bd.* (1982), 7 Ohio App.3d 1, 6, 7 OBR 1, 6, 453 N.E.2d 1262, 1268:

"Appellant contends the board improperly admitted many of the exhibits depicting appellant's alleged advertisements as they were hearsay. * * *

However, administrative boards are permitted some leeway in admitting hearsay consistent with due process. The Administrative Procedure Act provides that agencies must pass upon the admissibility of evidence but no attempt is made to formulate standards of admissibility. R.C. 119.09. General standards applicable to specific agencies are provided by particular statutes. These range from provisions that the agency shall not be bound by common-law or statutory rules of evidence to provisions that the evidence shall be submitted as in the trial of civil actions. R.C. 4715.37. (R.C. 4715.37 was repealed 3–15–82).

"As a general rule, even apart from specific statutes, administrative agencies are not bound by the strict rules of evidence applied in court. *Provident Sav. Bank & Trust Co. v. Tax Commission* (1931), 10 O.O. 469 [474, 26 Ohio Law Abs. 175, 181]. However, an administrative agency should not act upon evidence which is not admissible, competent, or probative of the facts which it is to determine. *Eastern Ohio Distributing Co. v. Bd. of Liquor Control* (1950), 59 Ohio Law Abs. 188 [190, 98 N.E.2d 330, 332]. The hearsay rule is relaxed in administrative proceedings, but the discretion to consider hearsay evidence cannot be exercised in an arbitrary manner."

In *Chesapeake & Ohio Ry. Co. v. Pub. Util. Comm.* (1955), 163 Ohio St. 252, 56 O.O. 237, 126 N.E.2d 314, the Supreme Court held in its syllabus:

"1. Although proceedings before the Public Utilities Commission are informal in character, yet, in an appeal in this court, where appellant seeks the reversal of an order of such commission on the ground that it is unlawful or unreasonable as being against the weight of the evidence, this court will examine the entire record to determine whether such order is based upon sufficient evidence, received under the established and recognized rules for the production of evidence. (Paragraph one of the syllabus in *Lykins v. Public Utilities Commission* [1926], 115 Ohio St. 376 [154 N.E. 249], approved and followed.)

"2. Where a record of a hearing before the Public Utilities Commission contains competent evidence along with incompetent evidence, and it is impossible to determine to what extent the order of the commission is based on the competent evidence, this court will not attempt to determine whether such order is based upon sufficient evidence unless the findings of the commission reveal that they are based on evidence received under established and recognized rules for the production of evidence."

Following these rules the Supreme Court found sufficient competent evidence adduced according to the established rules of evidence in *Lykins* and affirmed the findings of the Public Utilities Commission, but in *Chesapeake*

*and Ohio Ry. Co., supra*, it could not determine from the record whether the commission's order was based on competent or based on incompetent evidence, and reversed "until the cause is here upon proper findings." In neither of these two cases was the administrative tribunal's decision reversed because of the admission of incompetent evidence or because of the exclusion of competent evidence, but the Supreme Court in reviewing the record based its decision in each case wholly on the ultimate issue of whether there was competent evidence sufficient to support the decision of the administrative tribunal.

Much the same thing has happened respecting review of decisions of the BTA. In *Howard v. Cuyahoga Cty. Bd. of Revision* (1988), 37 Ohio St.3d 195, 196, 524 N.E.2d 887, 888, the Supreme Court recently cited with approval the following paragraphs of the syllabus in *Cardinal Federal S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d 83, 336 N.E.2d 433, holding:

"2. The Board of Tax Appeals is not required to adopt the valuation fixed by any expert or witness. * * *

"3. The Board of Tax Appeals is vested with wide discretion in determining the weight to be given to evidence and the credibility of witnesses which come before the board. * * *

"4. The fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities, and this court will not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it affirmatively appears from the record that such decision is unreasonable or unlawful. * * * [Citations omitted.]"

The Supreme Court reiterated these principles in *Howard*, and cited its determination in *Alliance Towers Ltd. v. Stark Cty. Bd. of Revision* (1988), 37 Ohio St.3d 16, 24, 523 N.E.2d 826, 833, to reverse because the BTA did not state specific reasons for changing its decision on reconsideration, and its determination in *Cleveland Public Library v. Cuyahoga Cty. Budget Comm.* (1986), 28 Ohio St.3d 390, 395, 28 OBR 448, 453, 504 N.E.2d 421, 426, to reverse because in the absence of the BTA's setting forth the basis of its finding in its decision, the Supreme Court could not perform its duty to affirm reasonable and to reverse unreasonable determinations. The Supreme Court then held that the decision being reviewed in *Howard* should be reversed and remanded for reconsideration in conformity with the court's opinion, with the BTA being required "to state what evidence it considered relevant in reaching

its value determinations." *Howard v. Cuyahoga Cty. Bd. of Revision* (1988), 37 Ohio St.3d 195, 197, 524 N.E.2d 887, 889.

■ Thus, we see the Supreme Court, respecting appeals from value decisions of the BTA, has arrived at conclusions similar to its conclusions respecting appeals from decisions of the PUCO. It does not reverse because of any error allegedly committed by the BTA in merely admitting incompetent evidence, but carrying out its duty to decide whether the BTA's decision is reasonable and lawful, reviews the record in light of the evidence which the BTA states it considered relevant in reaching its value determinations. If, within the scope of the evidence relied upon by the BTA, there is sufficient competent evidence of probative value to support its decision, the decision is neither against the weight of the evidence nor unlawful merely because incompetent evidence has also been received. The reviewing court may reverse and vacate the BTA decision or modify it only if it appears from the record and the court decides that the BTA decision is unreasonable or unlawful. If it does not affirmatively appear from the record that the BTA decision is unreasonable or unlawful, and if the reviewing court decides that it is reasonable and lawful, then the reviewing court must affirm.

■ With reference then to the summary and conclusion of the BTA in its decision in this case, hereinbefore quoted, it appears that in the proper exercise of its discretion as applied to the determination of true value of the laying houses, the BTA rejected the cost approach utilized by the appellant's expert appraiser (Hunt), who appeared as the appellant board of revision's only witness, and considered instead the testimony of the appellee taxpayer's two witnesses, *i.e.*, its general manager and its cost accountant, as being relevant and proper for its determination that the true value, or "market price" of an egg farm bears a direct relationship to its bird capacity. In its decision, which we find supported by the evidentiary transcript of its hearing, the BTA points to the general manager's testimony "that there was a recognized standard that places a value on buildings in relationship to the number of laying hens, called 'birds,' that the building housed." The evidentiary transcript discloses that he has been the taxpayer's general manager since 1978, that he has a master's degree in economics, and has been on the board of the Midwest Egg Producers for about a year, and fully familiar with the industry. The taxpayer's witness Moore testified that he is a certified public accountant, certified in 1971, that he has been with a nationally known and recognized firm of public accountants since 1970 where he has been a partner since 1976, that he is the director of tax services in his firm's special

business services unit, that he is also a graduate lawyer, and that his firm has represented the taxpayer almost since their original investment and does "the work for a number of other egg production facilities around the country and one other substantial egg production facility here in Ohio," the latter of which was the purchaser of Heartland, acquiring same for $395,000, or approximately $1.41 per bird capacity. In its decision the BTA concluded as to the taxpayer's two witnesses: "Although neither are professional appraisers, both exhibited knowledge of the subject property and the economics of the industry. Their testimony about the Heartland facility can not be ignored. * * * In the instant case the evidence is that Heartland and Day Lay, while not identical, are comparable in many respects. The factors of age, quality of construction, location and condition are almost equally present in each facility."

Thus, we have two witnesses, each testifying as to their personal knowledge and experience with relation to the true value of the buildings involved. Much personal knowledge, and much experience, has considerable hearsay foundation though it is not considered objectionably hearsay in character. Education in general, as well as the specialized education of experts, is acquired largely from the study of hearsay treatises, reports and books of others, which by reason of the varied education, expertise and reputations of the authors, become authoritative or not, as time and experience demonstrate their reliability. Thus, here we have two witnesses, one highly educated in economics and the other highly educated in accounting, and each having much experience in the management and financial aspects of a particular industry, testifying as to their acquired personal knowledge and experience as to market valuation of the production facilities of that industry. In our opinion both were qualified as experts, but, whether experts or not, they each also testified as to their personal knowledge of the valuation standard which they espoused. The general manager had the additional foundation of being the personal representative of an impersonal entity owner, a partnership, and, as such, stood in the shoes of the taxpayer. It is basic to the determination of market value that the owner, subject to its weight and credibility, may testify as to his concept of same. The certified public accountant had the additional foundation of being personally involved in the financial affairs of both the taxpayer and the purchaser of Heartland.

The standard of valuation to which each witness testified was a market value standard based on an income approach, effectively a product of cost accounting. Although not necessarily specifically testified to, it is implied that in a highly competitive industry such as the production and sale of

millions upon millions of eggs, where the difference between profit and loss may be dependent on the expenditure or savings of fractions of a cent, the true value of production facilities, once constructed, depends, at any particular time, not on their construction cost, but, in a free market, on how much income that facility can produce. That income, in turn, is measured, or limited, by the difference between the market value of the product of each bird, and the costs expended as to each bird to obtain that product. Thus, it is reasonable to conclude that the true value of laying houses will rise and fall in direct relation to the number of birds which they house and the income that the product of those birds will produce on the market.

■ The evidence of the taxpayer's witnesses relied upon by the BTA was not hearsay, was the better evidence on the ultimate issue before the BTA and sufficiently supported its decision. We do not find that such evidence was inadmissible on that issue for the reasons asserted by the appellant. Based thereon, it does not appear that that decision is against the weight of the evidence, nor does it affirmatively appear from the record that the decision of the BTA is unreasonable or unlawful. Accordingly, we conclude that the appellant's first, second and fourth assignments of error are not well taken.

Having found no error prejudicial to the appellant in any of the particulars assigned and argued, we find the decision of the BTA appealed from is reasonable and lawful and affirm same.

*Decision affirmed.*

BRYANT and MILLER, JJ., concur.

J. THOMAS GUERNSEY, J., retired, of the Third Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Ohio Constitution.