**ALTA PACIFIC ASSOCIATES, LTD.,
and Sevier Valley Development
Co., Petitioners,**

v.

**UTAH STATE TAX COMMISSION and
County Board of Equalization of Sevi-
er County, State of Utah, Respondents.**

No. 950192.

Supreme Court of Utah.

Jan. 7, 1997.

Richard C. Terry, Mark J. Morrise, Salt Lake City, for petitioners.

Jan Graham, Att'y Gen., Kelly W. Wright, Asst. Att'y Gen., Salt Lake City, for Tax Commission Rulon Don Brown, Richfield, and Bill Thomas Peters, Salt Lake City, for Board of Equalization.

RUSSON, Justice:

Alta Pacific Associates, Ltd., and Sevier Valley Development Co., owners of the Glenbrook Apartments and the Urcy Bell Apartments in Richfield, Utah (hereinafter collectively referred to as the owners), seek review of the Tax Commission's (the Commission) resolution of their appeal from the Sevier County Board of Equalization. Petitioners argue that in approving Sevier County's property tax assessments, the Commission failed to fully recognize that the apartments, built under special federal housing programs for the needy and the elderly, had less value as a result of the restraints on the property imposed by the federal schemes. We affirm.

## BACKGROUND

The Glenbrook and Urcy Bell Apartments were financed and operated under two federal housing programs for the benefit of the poor and the elderly. The Glenbrook Apartments participated in the program set forth in section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, and administered by the Department of Housing and Urban Development (HUD). The Urcy Bell Apartments participated in the Rural–Renting Housing Program of the United States Housing Act of 1949, 42 U.S.C. § 1485, administered by the Farmers Home Administration (FHA) within the Department of Agriculture.

Under both programs, the Glenbrook and Urcy Bell Apartments were guaranteed substantially higher rent than that received by comparable, nonparticipating apartments. The owners were guaranteed by contract that they would receive a set amount of rents regardless of the amount tenants actually paid. In HUD and FHA parlance, this amount was known as "contract rent." It consisted of the amounts tenants paid plus rental subsidies paid by either HUD or FHA directly to the owners to add up to an amount predetermined by the relevant federal agency. The contract rents were generally much higher than rent received in the local market. For example, in 1991, the average

monthly contract rent was $565 for the Glenwood Apartments and $335 for the Urcy Bell Apartments, whereas the market rent was $275 per month.

In addition to the guaranteed contract rents, the owners of the apartments received other benefits. For example, Phillip Carroll, who was the general partner for both owners, received a monthly fee of $1,881 for managing both complexes. Additionally, the programs guaranteed that even if a rental unit was vacant, the owner of that unit would still be paid a certain rate.

The owners also took advantage of loans offered by governmental entities. Under the FHA program, the owner of the Urcy Bell Apartments received a direct loan from FHA. The loan was a fifty-year mortgage agreement written at a 9% interest rate. Moreover, FHA provided the owner with an interest credit which reduced the effective interest rate to 1%. The owner of the Glenbrook Apartments entered into a forty-year mortgage agreement with a 10.33% interest rate.

In exchange for the beneficial financing and rental subsidies, the owners accepted regulatory burdens on their properties. First, both federal programs required that the apartments be used as low income housing for twenty years. Also, HUD and FHA had the right to set rental rates and to restrict the owner's financial return from the properties. The profits realized from the Urcy Bell Apartments were fixed at $5,240.92 per year. In addition, the programs required more construction and greater maintenance to accommodate elderly and handicapped tenants than was required of nonparticipating apartments. The owners were also required to help provide assistance to elderly tenants who needed medical care and food allowances.

Additionally, immediate repairs and higher maintenance standards were mandated, and the properties were always subject to governmental inspection. The owners also had to ensure that the housing programs were properly administered. On-site managers had to process tenant applications to determine if prospective tenants met federal qualifications for occupancy. There was also a significant amount of record keeping and reporting necessary to comply with governmental regulations. For example, costly yearly audits were required.

The Urcy Bell and Glenbrook Apartments were both located in Sevier County, and for the 1991 through 1993 tax years, the Sevier County Assessor determined that the fair market value of the Glenbrook Apartments was $700,000. For the 1992 and 1993 tax years, the county assessed the Urcy Bell Apartments' fair market value at $562,740. The owners appealed the assessments to the Sevier County Board of Equalization, which affirmed the assessed values.

Thereafter, the owners appealed the assessments to the Commission. During a formal hearing, Sevier County increased its assessments of the apartments. For each of the 1991 through 1993 tax years, the county increased its assessments of the Glenbrook Apartments to $1.1 million and the Urcy Bell Apartments' assessments to $750,000 for the 1992 and 1993 tax years. The owners, however, contended that Sevier County's assessments were too high and offered their own appraisals. The owners argued that the Glenbrook Apartments had a value of $420,000 in 1991, $435,000 in 1992, and $460,000 in 1993. The owners' appraisals for the Urcy Bell Apartments were $410,000 for the 1992 tax year and $432,000 for the 1993 tax year.

The discrepancies between the owners' assessments and Sevier County's assessments were based upon different applications of appraisal methodology. In assessing the Glenbrook and the Urcy Bell Apartments, both Sevier County and the owners used the income, cost, and comparable sales approaches to estimate the apartments' values. The income approach determines the value of property by, first, determining the reasonable income expected to be earned by the property. Next, that expected income is converted to present value by dividing that income by a capitalization rate. In other words, under the income approach,

$$\frac{income}{capitalization\ rate} = estimated\ value$$

The cost approach determines value on the basis of cost less depreciation. The comparable sales approach uses the prices at which comparable properties are sold to determine value. Following the applications of these approaches, the parties reconciled the approaches' results to single estimates of value based upon their opinions of the relative accuracy and probity of each of the approaches. Both parties relied heavily on the results of the income approach in their appraisals.

For the most part, the differences between Sevier County's assessments and the owners' assessments concerned the calculation of the apartments' income and the derivation of capitalization rates under the income approach. In assessing the value of both the Glenbrook Apartments and the Urcy Bell Apartments, Sevier County used the federally guaranteed contract rents as the apartments' income. At a formal hearing before the Commission, Sevier County's appraiser, Leroy Pia, testified that the contract rents were guaranteed as part of the government subsidy programs and, unlike the rents of nonparticipating apartments, were not at risk. In addition, Pia testified that the rental subsidies were transferrable and thus would be considered by a potential buyer of the properties. Pia also testified that using contract rents as the apartments' income was supported by the majority of published decisions and articles. For these reasons, Sevier County used the Glenbrook Apartments' and the Urcy Bell Apartments' actual contract rents as the apartments' income.

The owners contended that the use of contract rents under the income approach was improper. One of the owners' experts, Eric Johnson, who performed the owners' appraisals of the apartments, testified that the contract rents guaranteed by the federal housing programs should be ignored for two reasons. First, Johnson stated that for ad valorem tax purposes, the Commission had adopted a rule that properties should be appraised as if owned in unencumbered fee simple. *See* Property Tax Division of the Utah State Tax Commission, *Real Property Valuation Standards of Practice* 2 (Nov. 1995) [hereinafter Valuation Standards].

Characterizing the federal programs, including the contract rents, as encumbrances, Johnson testified that the properties should be valued without considering them. Second, Johnson testified that the apartments should be valued according to their highest and best use and that due to the burdensome federal programs, the highest and best use of the apartments was as apartments not participating in the federal programs. For these reasons, Johnson and the owners' other appraisal expert, William Lang, determined that the rent which comparable apartments realized in the local market was the best representative of the apartments' income under the income approach.

Another discrepancy between the owners' and Sevier County's income approaches concerned the calculation of capitalization rates. Capitalization rates are used in appraisals to convert future income into present value. Because the income is divided by the capitalization rate, a lower capitalization rate will yield a higher estimation of value. The rates can be calculated in various ways. Sevier County employed an 8.5% capitalization rate partly because it determined that the owners of the subsidized apartments were more likely to realize a return on their initial investments than owners of nonparticipating apartments. The owners, however, argued that the federal programs did not reduce the risk of losing their investments and therefore set their capitalization rate at a higher 10.75%.

In addition, the owners contended that Sevier County's assessments should be rejected because the county failed to adequately consider the burdens imposed by the federal programs. In addition to the disadvantages previously mentioned, Philip Carroll, the general partner of the owners, testified that during the twenty-year contract periods, the long-term mortgage agreements with the governmental entities could not be refinanced, and that after the twenty-year periods, governmental permission was required to refinance. Carroll also testified that there was a limited market for federally subsidized properties.

Sevier County responded that its assessments, particularly its income approach, sufficiently accounted for the regulatory bur-

dens. Its assessment of the Glenbrook Apartments stated:

> Arguments have been made that requirements for government subsidized projects cause ... high expense figures. After completing an appraisal of government subsidized projects in Ogden[,] Utah ..., we conclude that a small additional cost may be necessary to reflect HUD and federally regulated accounting systems and maintenance programs. However, this factor is not substantial. In no case did we find government subsidized projects that incurred expenses over $2,000 per unit....
>
> ... The [Glenbrook] project has expenses at around $2,000 per unit. All of the other projects[' expenses] range from ... $1,000 to $1,335 per unit. Again, a slight increase in expenses may be due to the regulations regarding government subsidies. As discussed above, $2,000 per unit seems to be the maximum. The [Glenbrook Apartments] is operating at the maximum; $2,000 per unit is just within reason.

In addition, Sevier County argued that the regulatory burdens imposed on the Urcy Bell Apartments were also taken into account. Sevier County pointed out that the high $2,000 per unit expense figure was also applied to its assessments of the Urcy Bell Apartments.

Aside from Sevier County's analysis of the federal restraints on the apartments, the only other examination of the restraints came from the owners' appraisals. Even though Johnson testified that the federal programs, including the contract rents, were burdens on the apartments and therefore should be ignored, he deducted 31% from the apartments' value calculated under the cost approach. This deduction was necessary, Johnson stated, to account for two adverse effects of the federal housing programs:

> The first is the extra expense associated with governmental subsidized housing management (say 6%) that reduces the net operating income along with the actual rent received by the landlord tied to the poverty level of the area; thus, a reduction of "return on the investment." In addition, subsidized properties as such, in most

recently known instances are generally concluded by ownership that the lack of disposition of the properties inhibits the ability of the property to have a "return of investment"....

Having heard the arguments and testimony presented by the parties, the Commission issued its final decision, which included its findings of fact and conclusions. The Commission found that the HUD and FHA housing programs created a "distinctly separate kind of property" that required assessors to value subsidized properties in light of the federal restraints and corresponding benefits. According to the Commission, "[t]he benefits of the subsidized · property are a value which is inherent in the total value of the property" and therefore the use of actual, contract rents was appropriate. In addition, the Commission favored Sevier County's 8.5% capitalization rate over the owners' 10.75% rate because the county's rate reflected the "lower risk [of not recouping initial investments] inherent in the property." Thus, the Commission determined that Sevier County's income approach "with its emphasis placed on actual rents ... is the most reflective analysis of the fair market value of the subject properties." On that basis, the Commission adopted Sevier County's $1.1 million assessments for the Glenbrook Apartments and its $750,000 assessments for the Urcy Bell Apartments. The owners sought review.

On review, the owners argue that (1) by including the benefits of the federal housing programs within the value of the apartments, the Commission violated the rule of appraisal that properties under assessment are to be valued as if they were owned as unencumbered, fee simple estates; (2) the Commission erred in finding that Sevier County's appraisal reflected the apartments' fair market value; (3) the Commission created a special class of federally subsidized property for assessment purposes in violation of the Uniform Operation of Laws Clause and the uniformity in taxation requirements of the Utah Constitution; and (4) the Commission's decision failed to properly account for the burdens imposed on the owners' apartments by the federal programs.

## ANALYSIS

The owners first argue that Sevier County's inclusion of the federal housing programs' benefits and the Commission's subsequent approval of the practice violated accepted standards of appraisal. The owners contend that pursuant to the Commission's own standards, property is valued as if owners had all rights over the property; as if the owner owned an absolute or fee simple estate. *See Valuation Standards* at 2. In this case, the federal government had significant rights over the subject properties. Thus, in valuing the subject properties, the owners argue, Sevier County should have combined the government's rights with the owners' rights and ignored the rental subsidies.

■ The Commission and Sevier County respond that the owners misunderstand the fee simple rule and mischaracterize the government subsidies as encumbrances. Sevier County argues that the fee simple rule is not a rule of law, but an appraisal guideline, and the application of such guidelines is an issue of fact. Therefore, the county argues, this court must afford deference to the Commission's determination and apply "a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a). Under such a standard, we must uphold the Commission's finding if it is " 'supported by substantial evidence based upon the record as a whole.' " *Beaver County v. Utah State Tax Comm'n,* 916 P.2d 344, 354 (Utah 1996) (quoting *Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992)). The county and the Commission further argue that the evidence received by the Commission demonstrates that the rental subsidies were not encumbrances and amply supports the use of the contract rents under the income approach.

The first question is whether the Commission's approval of the use of contract rents under the income approach is a finding of fact or a conclusion of law. If the approval amounts to a finding of fact, we must apply "a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a). On the other hand, if the approval is a conclusion of law, we must "grant the commission no def-erence [and apply] a correction of error standard" of review. *Id.* § 59–1–610(1)(b).

In *Beaver County v. Utah State Tax Commission,* we held that the proper application of appraisal methods was a question of fact:

> The proper application of appraisal techniques depends upon varying factual circumstances that defy generalization: " '[V]aluation is an art, not a science. It is a function of judgment, not of natural law. . . . [F]or example—true market value for purposes of ad valorem taxation is always an estimate, always an expression of judgment, always a result built on a foundation of suppositions about knowledgeable and willing buyers and sellers endowed with money and desire, whose desires are said to converge in a dollar description of the asset.' "

*Beaver County,* 916 P.2d at 355 (quoting *Utah Ass'n of Counties v. Tax Comm'n,* 895 P.2d 819, 825 (Utah 1995) (alteration in original) (quoting *Union Pac. R.R. v. State Tax Comm'n,* 716 F.Supp. 543, 554 (D.Utah 1988))). In another case, this court stated, "Because of the many different kinds of property and the various factors that affect their values, the determination of what constitutes equal 'in proportion to the value of . . . tangible property' . . . cannot be made by application of any single formula." *Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 188 (Utah 1984) (quoting Utah Const. art. XIII, § 3). These rulings apply in this case because the application of the fee simple rule is not a rule of law but merely an aspect of appraisal methodology.

The fee simple rule is a technique of appraisal whose application depends upon the specific characteristics of the property under assessment. The rule, as drafted by the Commission, provides, "For ad valorem tax purposes, properties are *generally* appraised as if all ownership rights and interests are attached, i.e., the fee simple interest." *Valuation Standards* at 2 (emphasis added). The word "generally" as used in the fee simple rule reveals that the rule was not drafted to apply in every case. The inclusion of the word implies that in some cases, property may be assessed in an encumbered state. In addition, none of the Commission's standards

should be presumed to apply in every case. Rather, the standards were drafted only "as a guide to achieve equity and uniformity in the administration of real property assessment." *Id.* at 1. Equity and uniformity are the ultimate goals of property assessment, and these goals cannot, in every case, be achieved by resort to a single guideline. *See Rio Algom Corp.*, 681 P.2d at 188. For these reasons, the fee simple rule is better viewed as merely a guideline for appraisal, and its utility and proper application, like all matters of appraisal methodology, is a question of fact. *See Beaver County*, 916 P.2d at 355.

Our past decisions reviewing Tax Commission determinations of fair market value have treated such issues as questions of fact. *See, e.g., Beaver County v. Utah State Tax Comm'n*, 919 P.2d 547, 553–54 (Utah 1996) (*Union Pacific*) (holding that tax commission's use of capitalization rate calculated with forecasted earnings is question of fact); *Beaver County v. Utah State Tax Comm'n*, 916 P.2d 344, 354–55 (Utah 1996) (*PacifiCorp*) (holding that use of average annual stock prices and weighting of indicators is question of fact); *Utah Ass'n of Counties v. Tax Comm'n*, 895 P.2d 819, 821 (Utah 1995) (characterizing tax commission's findings with respect to determination of fair market value as findings of fact); *Kennecott Corp. v. Utah State Tax Comm'n*, 858 P.2d 1381, 1386 (Utah 1993) (characterizing as finding of fact tax commission's utilization of capitalized net revenue method to value Kennecott's property); *Questar Pipeline Co. v. Utah State Tax Comm'n*, 850 P.2d 1175, 1176–77 (Utah 1993) (characterizing methodology determinations as findings of fact); *First Nat'l Bank v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990) (characterizing determination of fair market value as finding of fact).

The Tax Commission's valuation determinations—including the utilization of contract rents to value a particular piece of property—are highly fact-specific and involve a great deal of expertise. In making such determinations, the Commission is presented with the testimony of expert witnesses and makes factual findings on the basis of this evidence. As Justice Howe noted in *Utah Association of Counties v. Tax Commission:*

> The mere fact that two experts, both long trained in the area of valuation, can reach such an immense divergence of opinions is evidence of the nature of tax appraisal. . . . It is with this in mind that we have considered the unenviable responsibility of the Commission to sort out the great volume of evidence and "artistically" reach its valuation.

895 P.2d at 824–25. And as we stated in *Utah Department of Transportation v. Jones:*

> [T]he work of an appraiser, though it can be in a sense factual and scientific in some of its aspects, is also an art, in that it reflects the creative talents, the experience, the integrity, and in sum, the personalized judgment of the individualized appraiser. It is his prerogative to select and analogize the various factors which seem important to him in arriving at his estimate as to value. Therefore *no one should be able to put him in a straightjacket as to method.*

694 P.2d 1031, 1035 (Utah 1984) (emphasis added) (quoting *Redevelopment Agency of Salt Lake City v. Mitsui Investment, Inc.*, 522 P.2d 1370, 1373 (Utah 1974) (footnote omitted)).

However, contrary to precedent, Judge McIff's concurring opinion, joined by Chief Justice Zimmerman and Justice Durham, treats the Commission's decision to utilize contract rents in this case as a matter of law.[1]

Against the weight of this precedent, Chief Justice Zimmerman would bind the Tax Commission as a matter of law to consider contract rents regardless of expert testimony or other evidence. Chief Justice Zimmerman writes, "In the metaphor of [*State v. Pena*, 869 P.2d 932], we are saying only that as a matter of law, the broad pasture that the commission is permitted when addressing methods of valuation has boundaries, and one of those boundaries requires that it consider the terms of contract rents." But what if expert testimony indicated that consideration

---

1. As to this issue, Judge McIff's opinion represents a majority of the court.

of contract rents would distort the fair market value of the property in question? After all, consideration of contract rents may be applicable in a locality where the contract rents are higher than the market rents but may not be applicable in a locality where the market rents are higher than the contract rents. Into the mix would be added economic forecasts, population shifts, zoning, political changes, and the numerous other factors expert appraisers utilize in forming opinions as to fair market value of property. It is for this reason that this court has always held that tax commission determinations of fair market value involve findings of fact.

Tax Commission methodology determinations—here, the decision to apply contract rather than market rents—are not within *Pena*'s "pasture," whereby the size of the pasture determines the amount of discretion a judge or agency has in applying facts to law, as Chief Justice Zimmerman declares. Rather, the issue before us is purely factual. It is on the "open range" for the trier of fact to determine on the basis of the evidence presented.

Chief Justice Zimmerman states in his concurring opinion that our approach in labeling the question under consideration as factual is "result oriented." To the contrary, it is the approach taken by Chief Justice Zimmerman that is result oriented inasmuch as appellate judges are left free to enlarge or restrict the size of the pasture—without forewarning—depending on the result desired. On the other hand, labeling valuation questions factual clearly establishes the trial court's role to weigh the evidence before it in resolving such disputes, with the appellate court reviewing for substantial evidence.

■ Accordingly, I now continue my analysis and examine, as a question of fact, whether the Commission's decision to utilize contract rents to determine the fair market value of the subject property was supported by substantial evidence. As challengers, the owners bear the burden of demonstrating that factual findings are erroneous. To prevail, the owners must "marshal all of the evidence supporting the findings and show that despite the supporting facts and in light of the conflicting evidence, the findings are not supported by substantial evidence." *Beaver County,* 916 P.2d at 355–56. " 'Substantial evidence' is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank v. County Bd. of Equalization,* 799 P.2d 1163, 1165 (Utah 1990). Also, inconsistencies within one party's appraisal could support the approval of a competing and more consistent appraisal. *Cf. State v. Lancaster,* 765 P.2d 872, 873 (Utah 1988) (stating that defendant had opportunity to point out inconsistencies within a witness's testimony to impeach his credibility); *State v. Hewitt,* 689 P.2d 22, 24–25 (Utah 1984) (stating that palpable inconsistencies within testimony of prosecution witnesses could result in vacation of criminal conviction); *State v. Velarde,* 675 P.2d 1194, 1195 (Utah 1984) (per curiam) (holding that defendant's inconsistent testimony is legitimate basis for prosecutor's questioning his credibility).

The appraisals submitted by the owners were explained and supported by Eric Johnson and William Lang. Johnson and Lang testified that market rents rather than the contract rents should be used because the contract rents were indivisible parts of government programs that also imposed significant regulatory burdens. Following the fee simple rule, the experts testified, the burdens must not be considered and therefore neither should the contract rents. Johnson also advocated the use of market rent on the ground that the lower rent would have been the revenue the apartments would have received if put to their highest and best use. According to Johnson, due to burdensome regulations, the apartments would be more profitable as nonparticipating apartments receiving market rent as income than as participating, subsidized apartments receiving contract rents. Thus, Johnson testified, the apartments should be valued using market rents.

At the same time, however, Johnson testified that even if the apartments were valued as nonsubsidized housing, the appraisals would still be too high. Therefore, under the cost approach, Johnson included a 31% economic obsolescence factor due to the added

expenses of the housing programs. Thus, while the owners advocated that the benefits of the housing programs should not be considered because the benefits were part of a regulatory package that included significant burdens, their appraisal also made substantial adjustment for the regulatory burdens.

Sevier County's assessments, supported by Leroy Pia and Richard Cook, considered both the benefits and the burdens of the federal housing programs. Pia testified that the fee simple rule should not impede the use of contract rents. The object of appraisal standards, including the fee simple rule, is to ascertain full market value, and, according to Pia, consideration of the benefits of the federal programs is imperative to achieve that end. The highest and best use of the apartments, the county's experts testified, was as subsidized housing. Pia testified that in his opinion, the Glenbrook and Urcy Bell Apartments would sell for a much greater price than nonsubsidized apartments receiving lower rents and therefore had a higher market value. To account for the regulatory burdens, Sevier County assessments deducted the administration, maintenance, and additional expenses from the apartments' income.

We find Sevier County's approach to accounting for the benefits and the burdens of the federal programs to be supported by substantial evidence and more consistent than the owners' approach. The positions of both sides were supported by appraisals and expert testimony. However, the owners' position regarding the advantages and the disadvantages of the housing programs seems contradictory. The owners' experts testified that under the fee simple rule, the contract rents, because they are inextricably combined with federal restraints on the properties, should not be considered. But at the same time, the owners' appraisals made large deductions for the cost of the federal restraints. In other words, the owners ignored the elements of the federal programs that increased their apartments' value but included the elements that lessened it. As presented to the Commission, Sevier County's assessments were more consistent. Its assessments included the burdens and the benefits of the housing programs. Thus, the Commission was justified in resolving the parties' dispute by finding that Sevier County's approach better reflected the apartments' fair market value. Because this finding is supported by substantial evidence, we uphold the Commission's finding of approval.

■ The owners challenge other factual findings as well. The owners contend that Sevier County's assessments do not reflect the apartments' fair market value because (1) the assessments compared the apartments to properties outside Richfield, Utah; (2) the assessments ignored significant federal restraints on the apartments; and (3) the assessments' 8.5% capitalization rate was erroneous because there was no evidence that subsidized properties entailed a lower risk of nonreturn on investments than nonsubsidized properties. As with the Commission's finding regarding the propriety of using contract rents, we will uphold the Commission's factual findings if they are supported by substantial evidence.

The owners challenge the Commission's approval of Sevier County's assessments on the ground that the county improperly compared the Glenwood and Urcy Bell Apartments to similar properties outside Richfield, Utah. Comparable properties are often selected and used in property assessments to provide an analytical framework for valuing subject property. *See Beaver County v. Utah State Tax Comm'n,* 919 P.2d 547, 549 n. 4 (1996). The owners argue that while the Commission stated that the "Richfield subsidized complexes are considered to be a market unto themselves and should be compared to each other," it also ruled that Sevier County's assessments, which did not compare Richfield subsidized properties to each other, was "the most reflective analysis of the fair market value of the subject properties." Thus, the owners argue, Sevier County's assessments do not meet the Commission's own criteria and therefore should not have been approved.

■ The owners misunderstand the criteria county assessments must satisfy. County assessments are required to meet the standards of uniformity and equality set forth in the Utah Constitution and reflect fair market

value pursuant to the Utah Code. *See* Utah Const. art. XIII, §§ 2, 3; Utah Code Ann. § 59–2–103(1). If statements within the Commission's decisions impede the fulfillment of these constitutional and statutory directives, the Commission's statements must be ignored. *See Crossroads Plaza Ass'n v. Pratt*, 912 P.2d 961, 965 (Utah 1996) (stating that agency rulings must accord with governing statutes).

This principle applies in this case. The Commission's preference that subsidized apartments should be compared with other local subsidized apartments is most likely sound. Local properties are more likely than foreign properties to be influenced by the market conditions that influence the subject property and thus are a better clue to determine the subject property's value. However, when obedience to this guideline fails to produce accurate estimations of value, the guideline must not be applied. In this case, comparison of the Glenbrook and Urcy Bell Apartments with other subsidized Richfield apartments would not have contributed to an accurate calculation of the apartments' fair market value for the simple reason that there were no other subsidized apartments in Richfield. For this reason, Sevier County looked to nonsubsidized housing in Richfield and subsidized housing outside Richfield for comparisons.

In fact, the owners' appraiser also looked to properties outside Richfield to calculate the apartments' value under each of the appraisal approaches. Under the sales comparison approach, Johnson cited conveyances of property in Ephraim, Cedar City, and St. George, Utah. In addition, under the cost approach, the expert compared the Urcy Bell and Glenbrook Apartments to properties in Bountiful, Provo, Cedar City, Kanab, and Salt Lake City, Utah. In addition, Johnson testified that under the income approach, he relied on a 1993 report of apartments in the Salt Lake City area. Because substantial evidence, including that of the owner's expert, supports the use of properties outside Richfield as comparable properties, we uphold the Commission's approval of Sevier County's use of comparable properties outside Richfield.

The next factual finding the owners contest is the Commission's finding that Sevier County's appraisals adequately took into account the federal burdens imposed upon the Glenbrook and Urcy Bell Apartments. Specifically, the owners contend that the County's assessments failed to account for (1) the government restrictions on the amount of profit the Urcy Bell Apartments can earn; (2) the comparatively low profit margin associated with the Glenbrook Apartments; (3) the long-term mortgages and the Glenbrook Apartments' high 10.33% interest rate; (4) the necessity of obtaining government approval to refinance the Glenbrook Apartments' forty-year mortgage and the Urcy Bell Apartments' fifty-year mortgage after the twenty-year contracts expire; (5) the inability to refinance the mortgages at all during the twenty-year contract periods; and (6) the limited market for federally subsidized properties.

Sevier County's assessments, however, did take into account the federal restraints. In its assessments, Sevier County increased the amount of operating expenses to compensate for the obligations imposed by the federal programs. Sevier County deducted $2,000 from the revenue of each apartment unit under the income approach "due to the regulations regarding government subsidies."

Furthermore, although Sevier County's assessments did not detail how each of the regulatory restraints impacted its assessments, this is not a ground for reversal since the owners' appraisals did no better. "[W]here the taxpayer claims error, it has an obligation, not only to show substantial error or impropriety in the assessment, but also to provide a sound evidentiary basis upon which the Commission could adopt a lower valuation." *Utah Power & Light Co. v. Utah State Tax Comm'n*, 590 P.2d 332, 335 (Utah 1979); *accord Hercules Inc. v. Utah State Tax Comm'n*, 877 P.2d 169, 172 (Utah.Ct.App. 1994). In this case, even if Sevier County's assessments should have provided a detailed analysis of each of the federally imposed restraints, the owners failed to detail how each of the burdens lead to lower valuations.

In fact, the owners argued that the federal burdens should not be considered at all. The

owners contended that under the fee simple appraisal rule, the burdens of the housing programs, which included the contract rents, should not be taken into account. Thus, the owners had advocated to the Commission what they now object to.

 The closest approximation to the analysis the owners now demand was included within their cost approach. Under that approach, the owners calculated an economic obsolescence rate of 31% and reduced the apartments' value under the cost approach by that amount. But in arriving at this rate, the owners' appraisals failed to describe how each regulatory restriction impacted the rate. Instead, the owners' assessments provided only two reasons for the high obsolescence rate.

The first is the extra expense associated with governmental subsidized housing management (say 6%) that reduces the net operating income along with the actual rent received by the landlord tied to the poverty level of the area; thus a reduction of "return on the investment." In addition, subsidized properties as such, in most recently known instances are generally concluded by ownership that the lack of disposition of the properties inhibits the ability of the property to have a "return of investment". . . .

Nowhere in the appraisals' explanation for its 31% economic obsolescence rate were the specific federal restraints mentioned. During their testimony, the owners' appraisal experts also failed to explain how each of the federal burdens impacted the appraisal. Thus, even if Sevier County's assessments were flawed for failing to account for each and every regulatory burden, reversal of the Commission's approval would be inappropriate because the owners failed to suggest a sound alternative method to correct the flaws.

 The final contested factual finding is the Commission's finding that Sevier County's 8.5% capitalization rate under the income approach was proper since that rate reflects

the apartments' lower risk of nonreturn on initial investments. The owners contend that no substantial evidence supports the finding that the Glenbrook and Urcy Bell Apartments had a lower risk of nonreturn on investments. In fact, the owners argue, compliance with the federal regulations created a great deal of risk.

We find that substantial evidence supports the Commission's finding that the owners were likely to realize a return on their investments. Both sides admitted that the housing programs guaranteed for each rental unit a monthly rent that was well above the local market rent. In fact, the owners could receive guaranteed rents for vacant units. In addition, even though the return on the Urcy Bell Apartments was fixed at $5,240.92 per year, plus a management fee of $840 per month, the likelihood that the owner would lose its investment was not increased. With that guaranteed income, the owner would likely recoup its investment eventually. And even though operation of the apartments entailed significant expense to comply with the federal regulations, Sevier County's experts testified that even after deducting those expenses from the apartments' revenue, the apartments' owners would still realize a significant gain. Because substantial evidence supports the Commission's finding that the federal programs guaranteed a low risk of the owners' losing their investments, we uphold this finding.

In addition to the objections to the Commission's factual determinations, the owners argue that the Commission created special rules of assessment for federally subsidized apartments in violation of the uniform operation of laws clause[2] and the uniformity in taxation requirement of article XIII, section 2 of the Utah Constitution.[3] The owners' argument under both clauses is the same. They argue that the Commission's order singles out subsidized properties for unfavorable treatment.

2. The uniform operation of laws clause of the Utah Constitution provides, "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24.

3. In pertinent part, article XIII, section 2 of the Utah Constitution provides, "All tangible property in the state . . . shall be taxed at a uniform and equal rate in proportion to its value."

In relevant part, the Commission's order provides:

> The Commission considers the multi housing market in the Richfield area to be two markets. One a subsided housing market and the other non-subsidized. The Richfield subsidized complexes are considered to be a market unto themselves and should be compared to each other.

The Commission also ruled that the use of actual contract rents was appropriate under the income approach. The owners argue that the Commission's acceptance of actual rents for subsidized properties differs from its general practice with regard to nonsubsidized properties. With regard to assessments of those properties, the owners contend, the Commission demands the use of market rents, not actual rents. According to the owners, this classification scheme violates Utah's uniform operation of laws clause and its uniformity in taxation requirements.

Sevier County responds that the Commission did not create a special class of property for assessment purposes. In addition, the Commission responds that even if it did, the classification is proper because it meets the test of permissible classification enunciated by this court in *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989).[4]

Although the owners' argument is based upon both the uniform operation of laws clause and the uniformity in taxation requirements of the Utah Constitution, they make no argument as to how, if we were to uphold the Commission's decision under one clause, the decision would still violate the other. Therefore, we will treat the owners' contentions as one single argument with two legal bases. *See State v. Anderson*, 910 P.2d 1229, 1233 n. 3 (Utah 1996).

The standard of review for this issue is governed by section 59–1–610 of the Utah Code. That section provides, "When reviewing formal adjudicative proceedings commenced before the commission, the ... Supreme Court shall ... grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court." Utah Code Ann. § 59–1–610(1)(b). The question of whether the Commission created a classification of property for tax purposes in violation of the Utah Constitution is a question of law. *See State v. Bishop*, 717 P.2d 261, 266 (Utah 1986). Because there is no statute at issue before this court, section 59–1–610(1)(b) demands that we address this issue under a correction of error standard of review.

 A fundamental principle of the uniform operation of laws clause is that "the law should treat persons who are similarly situated in a similar fashion, and persons who are dissimilarly situated should be treated dissimilarly." *Bishop*, 717 P.2d at 266. The owners' constitutional argument relies on what they perceive as the Commission's singling out subsidized apartments for unfavorable treatment. The owners contend that while the Commission requires the use of market rents in nonsubsidized property assessments, it approved the use of actual rents for assessments of subsidized apartments.

The owners cite a prior Commission decision, *Mall Development Partnership v. County Board of Equalization*, Nos. 84–1142 to 84–1146 (Utah State Tax Commission Jan. 27, 1988), for the proposition that market rents alone are the appropriate measure of income to be used under the income approach to valuation. In that case, the Commission stated, "The Tax Commission adheres to the policy that economic [or market] rent and not actual rent is to be used when estimating market value pursuant to the income approach." *Id.* at 5.

However, further examination of the *Mall Development Partnership* decision reveals that market rent is not the Commission's sole method of calculating income. Not only did the Commission consider the rents of comparable properties in the market, it also considered whether using market rents as the sole

---

**4.** This decision ruled that whether a classification is permissible depends upon "[1] whether the classification is reasonable, [2] whether the objectives of the legislative action are legitimate, and [3] whether there is a reasonable relationship between the classification and the legislative purposes." *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 637 (Utah 1989).

measure of income would have left any of the subject property's income unassessed. *See id.* at 6. The Commission approved the use of market rents only because "[t]here is no remaining unused income potential of the subject property." *Id.* If there had been unused or unassessed income potential, the assessment would have failed to reflect the property's full market value: "Had it been established that the subject property ... contained unused income potential, then [the county's] assertion that [the assessment] has valued less than a fee simple interest would be well taken." *Id.* Thus, *Mall Development Partnership* reveals that the Commission endorses the use of market rents unless those rents fail to include all the income potential of the property and therefore fail to reflect full market value.

 The Commission's practice comports with statutory and constitutional mandates. Article XIII, section 2 of the Utah Constitution demands that "[all] tangible property in the state ... shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law." The legislature has decided that "[all] tangible property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value." Utah Code Ann. § 59–2–103(1). The object of such uniformity and equality is "so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property." Utah Const. art. XIII, § 3(1); *see also Rio Algom Corp. v. San Juan County,* 681 P.2d 184, 192 (Utah 1984) ("The objective is to assure that the taxes that are levied in a given county will result in each property's being 'accountable for its pro rata share of the burden of local government.'" (quoting *Appeal of Johnstown Assocs.,* 494 Pa. 433, 431 A.2d 932, 934 (1981))); *Kennecott Copper Corp. v. Salt Lake County,* 799 P.2d 1156, 1160 (Utah 1990) ("Reasonable uniformity of assessment is essential if every person and corporation is to be taxed in the same proportion to 'his, her, and its tangible property.'" (quoting Utah Const. art. XIII, § 3(1))). Thus, Utah law demands that all entities pay taxes in proportion to their property's full market value. *See Kennecott Copper Corp. v. Salt Lake County,* 799 P.2d 1156, 1161–62 (Utah

1990) (holding that formula used to assess mines must yield mines' full cash value); *Rio Algom Corp.,* 681 P.2d at 195 (holding statute unconstitutional which partially froze in time valuation of some properties because it prevented the ascertainment of full market value); *Moon Lake Elec. Ass'n v. Utah State Tax Comm'n,* 9 Utah 2d 384, 387, 345 P.2d 612, 614 (1959) (holding statutory formula unconstitutional that fixed assessments for tax purposes because it prevented the ascertainment of full market value). If some properties could be assessed below full market value, and if taxes could be calculated on that basis, the owners of the properties could avoid accountability for their share of governmental expenses, and the goal of uniformity and equality would be defeated.

Viewed in this light, the Commission's order did not create a classification scheme that sets subsidized property apart from other types of property for assessment purposes. The Commission's overarching goal is the equality and uniformity that results from valuing property at its full market value. When the use of market rents fails to achieve that end, income must be measured in some other way. In this case, the Commission approved the assessments that reflected full market value and thereby achieved the goals of equality and uniformity. There was no question that the Glenbrook and the Urcy Bell Apartments received substantially higher rents than the rents received by nonsubsidized apartments in the area. Therefore, in determining the Glenbrook and Urcy Bell Apartments' fair market value, the Commission justifiably rejected the use of market rents and endorsed the use of the actual, contract rents. Since the subsidized apartments in this case were treated no differently than other apartments, no classification was made, and thus no constitutional violation occurred.

 The owners' final argument is that the Commission erred by failing to state how the federal restraints on their apartments should be accounted for in county assessments. According to the owners, although the Commission determined how the benefits of the federal program should be taken into

account, through the use of contract rents, it failed to detail how the burdens impacted the apartments' value. The harm alleged by the owners as a result of this failure is that "county assessors implementing this decision will also ignore this issue, leading to incorrect valuations." To ameliorate this alleged error, the owners request that we remand this case to the Commission for supplemental findings.

However, even if the Commission did err in failing to detail the effect of the federal burdens, we are precluded from granting the owners' requested relief. The Utah Administrative Procedures Act, which governs appeals from the Commission, *see* Utah Code Ann. § 63–46b–1(2)(b), requires that to obtain relief, the owners must have been "substantially prejudiced" by the complained-of agency action. *Id.* § 63–46b–16(4).

> [F]or a reviewing court to grant relief under the [Utah Administrative Procedures Act], it must determine that the party has been "substantially prejudiced" by the complained of agency action. In other words, we must be able to determine that the alleged error was not harmless. Thus, the aggrieved party must be able to demonstrate how the agency's action prejudiced it.

*Mountain Fuel Supply Co. v. Public Serv. Comm'n,* 861 P.2d 414, 423 (Utah 1993) (citations omitted). "[A]n error is harmful only if the likelihood of a different outcome is sufficiently high as to undermine our confidence in the [outcome]." *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 796 (Utah 1991); *see Mountain Fuel Co.,* 861 P.2d at 423.

In this case, the only harm the owners allege as a result of the Commission's failure to detail how the federal restraints should be assessed is that counties performing future assessments on subsidized housing will ignore the restraints. The owners fail to demonstrate how the Commission's error in any way harmed them. Thus, we cannot say that the Commission's failure to detail the effect of the federal burdens undermines our confidence in the outcome, and we are therefore precluded from granting the owners' requested relief. For this reason, we decline to determine whether the Commission erred. *See State v. Hovater,* 914 P.2d 37, 44–45 (Utah 1996) (refusing to determine whether error occurred since alleged error did not prejudice appellant); *State v. Germonto,* 868 P.2d 50, 58 (Utah 1993) (same).

## CONCLUSION

We conclude that (1) the Commission did not err in approving the use of the Glenbrook and Urcy Bell Apartments' contract rents under Sevier County's income approach to valuation; (2) the Commission's findings that Sevier County's assessments reflected the apartments' fair market value are supported by substantial evidence; (3) the Commission's approval of the use of contract rents over the use of market rent did not violate either the uniform operation of laws clause or the uniformity in taxation requirements of the Utah Constitution; and (4) the owners failed to demonstrate how they were prejudiced by the Commission's alleged failure to detail the effect of the federal restraints on the apartments' value. We therefore affirm.

ZIMMERMAN, Chief Justice, concurring:

I join in the opinion of Judge McIff and write only to respond to Justice Russon's characterization of the standard of review adopted by a majority in this case.

Justice Russon's opinion suggests that there are only two operative standards of review: One applicable to matters of law, which calls upon this court to redetermine any matter coming before it without granting any deference to the forum below, and the other applicable to questions of fact, which calls upon us to defer to the forum below if there is any substantial evidence to support its action. He characterizes Judge McIff's position, which describes the principle now before us as one of law, as requiring that, in the future, this court must make a detailed inquiry regarding every aspect of every evaluation practice adopted by the Tax Commission. With all deference, the one-size-fits-all characterization Justice Russon places on the operation of the standard of review applicable to law questions when they are part of a mixed question of law and fact is far too

simplistic, as we explained in *State v. Pena*, 869 P.2d 932, 936 (Utah 1994). When an appellate court reviews a determination that involves a mixed question of law and fact, the operative standard of review, i.e., the actual level of scrutiny applied by the appellate court, may vary, even though the ultimate question reviewed involves a statement of the law. On some, we permit a broad range of discretion, *see Hansen v. Stewart*, 761 P.2d 14, 17–18 (Utah 1988) (granting broad discretion to trial court in deciding whether to grant or deny new trial based on insufficiency of evidence), on others we do not, *see State v. Thurman*, 846 P.2d 1256, 1269–71 (Utah 1993) (granting narrow discretion to trial court decisions involving consent to search that would otherwise violate Fourth Amendment). The characterization of an issue as a mixed question of law and fact sometimes begins, rather than ends, the inquiry as to how closely the appellate court will scrutinize what the initial forum has done. *Pena*, 869 P.2d at 937.

In the present case, the fact that, as an analytical matter, we conclude that the determination made by the commission is grounded on a question of law—whether the commission may consider contract rents, as opposed to market rents, in the subsidized housing context—says little about the closeness of the scrutiny we will give the commission's decision on exactly what weight it may give those subsidized contract rents in reaching a fair market value determination, and it says nothing about how we will review the commission's approach to applying any other valuation methodology. The majority holds only that, in the metaphor of *Pena*, the broad pasture that the commission is permitted when addressing methods of valuation has boundaries, and one of those boundaries requires that it consider the terms of subsidized contract rents. *See id.* at 937–38. As for the weight the commission chooses to give this factor, we say only that the question is within the broad pasture accorded it. When such rents differ from market, the commission does not exceed the discretion the law gives it when it decides to place primary emphasis on them in making a valuation.

The fact that labeling a question a matter of law may permit this court to define and, ultimately, to constrict the pasture within which an agency or a trial court is permitted to roam, does not mean that we must do so. For that reason, it does not portend the evils that Justice Russon suggests. As we noted in *Pena*, there are substantial institutional reasons why appellate courts refrain from substituting their judgment for that of an agency or trial court on mixed questions of fact and law in any particular area, even if they have the power to do so. *Id.* at 938–40. Those reasons apply with particular force when we are addressing fact-intensive valuation decisions dependent on a multitude of factors and made by an agency that has expertise in an area. *Id.* at 940. On the other hand, merely because we permit an agency or trial court broad discretion does not mean, as Justice Russon would characterize it, that the standard of review is one appropriate to questions of fact, rather than law. That sort of approach to labeling the question under consideration is result oriented, rather than based on an analysis of the issue being addressed, and serves only to make careful, candid appellate analysis of mixed questions of law and fact more difficult. Carefully exercised self-restraint is the real guardian of the proper relationship between trial and appellate fora, not simple, conclusory labels of "law" and "fact," labels that history has shown are not capable of standing in the way of an appellate court's exercising searching review when it thinks it appropriate, *see id.* at 936–38, but are capable of producing much confusion in the standard of review area. *Id.* at 936 (citing Evan Tsen Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict*, 64 S. Cal. L.Rev. 235, 239–45 (1991)).

DURHAM, J., and McIFF, District Judge, concur.

HOWE, Justice, concurring:

I concur in the opinion of Justice Russon and also in the observations made by Judge McIff in Part B of his opinion regarding "Duration of Contract Term."

McIFF, District Judge, concurring:

I concur in the result reached in the lead opinion and generally concur with its reasoning. I write separately to address two matters: (1) the applicable standard of review and (2) the importance of considering the duration of the federal contracts and the rental subsidies.

### A. Standard of Review

The lead opinion concludes that the Commission's decision to treat federally subsidized projects as a distinctly separate type of property and to consider the benefits and burdens of the federal contracts amounts to a finding of fact. As such, it would be entitled to "deference," governed by a "substantial evidence standard on review," Utah Code Ann. § 59–1–610(1)(a), rather than the "correction of error" standard applicable to conclusions of law. Utah Code Ann. § 59–1–610(1)(b).

If the lead opinion is correct, then presumably, a Commission decision to completely disregard the federal contracts and the subsidized rents would likewise have been entitled to deference. That is a more sobering proposition. The valuation swing that would have resulted from a complete disregard of contract rents is, by any measure, overwhelming. Using contract rents, the Commission put the values for the Glenbrook and Urcy Belle Apartments at $1,100,000 and $750,000, respectively, whereas market rents supported appraisals only in the $500,000 range for each complex.

While the Commission has urged this court to construe the issues as factual in nature, its written findings of fact, conclusions of law, and final decision are not entirely consistent with this position. The Commission acknowledges that it was not called upon to resolve conflicts in the evidence; to the contrary, the evidence was essentially not in dispute. Rather, the Commission, as well as the parties, in reality, want legal guidance. In its findings, the Commission noted:

Both appraisals relied heavily upon the income approach in their final determination of fair market value, and both used many of the same comparable sales and comparable rents in their analysis.

While the appraisers disputed some points on one another's appraisals, the real issue focuses on methodology, specifically how to value federally subsidized housing.

The parties in these cases ask the Tax Commission to determine whether or not the benefits and burdens related to federally subsidized rental housing contracts should be considered in determining the value of these properties for ad valorem tax purposes.

Both sides recognize that *the issue is a legal one* and certainly is of first impression for the Tax Commission and consequently, the Utah courts.

(Emphasis added.)

In its conclusions of law, the Commission opined that "there exists mass controversy and confusion over how to value federally subsidized housing." It supported this observation by contrasting the holdings in two cases on which the parties herein continue to rely. While the cases reach different conclusions, they are in accord in one respect, i.e., each treats the issue as being legal rather than factual in nature.

In *Alliance Towers v. Stark County Board of Revision,* 37 Ohio St.3d 16, 523 N.E.2d 826 (1988), relied upon herein by the landowners, the Ohio Supreme Court held that the fee simple estate is to be valued as if it were unencumbered, that the contract rents (federally subsidized) did not indicate the true value of the property and were not competent evidence thereof, and that the analysis by the county's appraiser was flawed by reliance thereon. *Id.*, 523 N.E.2d at 831–33. The opposite result was reached by the Supreme Court of Illinois in *Kankakee County v. Property Tax Appeal Board,* 131 Ill.2d 1, 136 Ill.Dec. 76, 544 N.E.2d 762 (1989). It held:

[W]e conclude that the PTAB erred *as a matter of law* in accepting a valuation that relied only on the rent the property would command in the open market of unsubsidized housing. A government subsidy contract that enhances the income-earning capacity of a particular piece of property *must be considered* in assessing the fair

cash value of that property for taxation purposes.

*Id.*, 136 Ill.Dec. at 83, 544 N.E.2d at 769 (emphasis added).

The Commission opted to go with the position advanced in *Kankakee*. Its decision, which followed the findings outlined above, has the clear sound and impact of a legal conclusion. The Commission's response to what it termed a "legal" issue "of first impression" is as follows:

> The Commission recognizes that the special federal financing programs offered through HUD section 8 and FmHA have created a distinctly separate kind of property that requires the assessing entity to value the property in question in light of the federal restraints and benefits.

On review, petitioners argue, "As a matter of law, this ruling is in error." The lead opinion disregards the clear manner in which the issue is thus cast and mischaracterizes the majority's position. Petitioners urge this court to hold that the benefits and burdens of the federal contracts should be *ignored* and that the Commission should be precluded, as a matter of law, from considering them. The majority rejects that position. Rather than imposing a "straightjacket," which Justice Russon apparently perceives, the majority frees the Commission from the one urged by petitioners. Moreover, the concept may be less applicable to the Commission than to a fee appraiser. In *Redevelopment Agency of Salt Lake City v. Mitsui Investments, Inc.*, 522 P.2d 1370, 1373 (Utah 1974), which gave birth to the straightjacket language,[1] the condemnor challenged the admissibility of an allegedly deficient appraisal prepared by the landowner's appraiser. In extending wide latitude to the appraiser and allowing admission, the court reasoned that the alleged deficiencies could be exposed during cross-examination and the fact finder (jury) could determine the weight to be given. *Id.* In the instant case, the Commission is the fact finder as well as the decider of legal issues. It expresses more than an opinion to be weighed against the opinions of others; it performs a "quasi judicial" function, *County Bd. of Equalization of Kane County v. State Tax Comm'n*, 88 Utah 219, 223–24, 50 P.2d 418, 421 (1935), and its expressions become the law of the case. There is nothing in *Mitsui* or any other known precedent which would preclude this court from clarifying the parameters within which the Commission may employ its expertise. To the contrary, it is this court's role to determine whether the statute, method, or rule of appraisement pursuant to which property has been valued will achieve the constitutional imperative of equal taxation. *See Kennecott Corp. v. Salt Lake County*, 702 P.2d 451, 455 (Utah 1985).

If the Commission's ruling is judged by a correction of error standard, the result is the same as that reached in the lead opinion. The reasoning of the *Kankakee* court is clearly superior to that reflected in *Alliance Tower*. It recognizes the obvious: "A willing buyer would most certainly consider the guaranteed income rate set by the Federal government when determining the fair cash value of the property." *Kankakee*, 136 Ill. Dec. at 83, 544 N.E.2d at 769. Utah law presumes that in arriving at "fair market value," both buyer and seller would have "reasonable knowledge of the relevant facts." Utah Code Ann. § 59-2-102(8). It follows that they would be expected to make reasonable decisions in light of this information, and accordingly, it is not credible to assume that they would be oblivious to the value-enhancing impact of significantly higher federally guaranteed rents.

Employing a different standard of review does not undermine the essential reasoning and analysis contained in the lead opinion. What is stated therein about the appraisal process continues to apply. Valuation is "'an art, not a science,'" *Beaver County v. Utah State Tax Comm'n*, 916 P.2d 344, 355 (Utah 1996) (*Beaver County I*) (quoting *Utah Ass'n of Counties v. Tax Comm'n*, 895 P.2d 825, 828 (Utah 1995)); "any single formula" is inadequate, *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 188 (Utah 1984); and the so-called fee simple rule is not a rule of law, but a technique of appraisal generally but not always employed. The legal conclusion that the benefits and burdens of the

---

1. The concept was applied in similar circumstances and for the same basic purpose in *Department of Transportation v. Jones*, 694 P.2d 1031, 1035 (Utah 1984).

federal contracts must be considered simply clarifies the framework within which the Commission has flexibility to employ its expertise.

Notwithstanding the necessity of flexibility in appraisal methodology and the deference to which the Commission is entitled, there must always be borders—outer limits—which circumscribe the permissible area of judgment and discretion and guard against appraisal approaches which may lead to aberrations. To hold otherwise would be to license a potentially capricious, irrational, or unreasonable result. For this reason, methodology cannot always, in every case, be solely a question of fact. In *Beaver County v. State Tax Commission*, 919 P.2d 547 (Utah 1996) (Stewart, J., separate opinion) (*Beaver County II*), Justice Stewart perceives the same incorrect characterization which seems to me to exist in this case. He states:

> The Commission has developed significant and substantial expertise in dealing with highly complicated matters of valuation, which, as the majority opinion points out, do indeed involve matters of opinion and judgment. For that reason, it is appropriate for this Court to defer to the Commission's expertise, as long as the methodology rests on a reasonable and consistent application of sound principles for determining fair market value. It is hardly appropriate, however, for this Court to act as if the Commission's methodology is an issue of fact whereby this Court all but abandons its constitutional and statutory responsibilities of judicial review by treating that which is not a factual inquiry as if it were.

*Id.* at 556.[2]

The existence of limitations which move judicial review beyond the "substantial evidence" standard appears to have been recognized by our court of appeals in a case arising from the Industrial Commission. The court stated:

> The decision of the Commission is entitled to deference because of the agency's expertise. However, the decision is subject to judicial review to assure that the facts support the conclusions arrived at by the Commission *and* that the decision *falls within the limits of reasonableness or rationality.*

*Gay Hill Field Serv. v. Board of Review,* 750 P.2d 606, 608 (Utah.Ct.App.1988) (citations omitted) (emphasis added).

For the Commission to have refused to consider the benefits and burdens of the federal contracts, including the guaranteed rents, would have breached the outer limits of permissible appraisal methodology and would not, in my judgment, have been entitled to deference. That was the holding in *Kankakee* and should be adopted here. The fact that the Commission embraced the correct legal position does not change the fundamental nature of its ruling. The Commission's decision to consider the federal contracts and to treat federally subsidized housing as a "distinctly separate kind of property" should be upheld because it is legally correct, not because the Commission is owed deference as to its factual findings.[3]

Moreover, it is not at all unlikely that the appraisers will come much closer to unanimity once the ground rules are clarified. Having one set of appraisers *concluding* that it is improper to consider the federal contracts and another set of appraisers proceeding from the opposite premise creates an irrecon-

---

**2.** Whether *Beaver County II* was correctly decided and whether the issues therein were properly characterized is not germane to this case. The language from the separate opinion is cited solely to buttress my conclusion that the Commission's "methodology" is not without some limitations which are *legally* imposed and concerning which a correction of error standard is applicable.

**3.** The lead opinion should consider inconsistencies with the stance taken by this court in review of decisions from other state agencies. For ex-

ample, in *Stewart v. Public Service Commission,* 885 P.2d 759, 770 (Utah 1994), the court held, "The *factors* that the Commission may legitimately take into account in determining a rate of return are *questions of law.*" (Emphasis added.) There may be legitimate distinctions between the approach to "rate" fixing by the Public Service Commission and the ascertainment of "fair market value" by the Tax Commission, but in either case, there simply must be legal boundaries which cannot be overstepped in the employment of expertise and the exercise of discretion.

cilable methodology conflict which cannot reasonably be expected to result in comparative appraisals that will be helpful to the Commission. It is appropriate for this court to resolve the conflict, as did the *Kankakee* court, by holding that the benefits and burdens of the federal contracts, including the contract rents, *must be considered.*[4]

I hasten to add that the obligation to consider contract rents is not tantamount to requiring their employment. The Commission would retain wide latitude to evaluate their impact and to devise and employ the methodology that will best achieve the intended objective: namely, the determination of "fair market value." The *Kankakee* court succinctly noted this latitude, suggested a caution, and identified important factors the taxing authority should consider:

> We do not mean to suggest that the tax assessor, in applying the income approach to valuation, is limited to and must accept the actual rental figure under the government subsidy contract as the sole measure of projected income. In most cases, such an approach would lead to a distorted measure of fair cash value. Factors such as the transferability of the subsidy contract, *the remaining term of the contract* and restrictions on the amount of return on capital investment would certainly affect the value of the property. A valuation approach which considers the subsidy income, but does not consider the negative aspects of a subsidy agreement upon the earning capacity of subsidized property, would be inappropriate. The taxing authority must weigh both the positive and the negative aspects of the subsidy agreement and adjust the actual income figure to accurately reflect the true earning capacity of the property in question.

136 Ill.Dec. at 83, 544 N.E.2d at 769 (emphasis added).

### B. Duration of Contract Term

The emphasis added to the *Kankakee* court's language quoted above highlights a potentially important area which was not addressed by the Tax Commission. Neither party adequately focused on the fact that the contract rents are guaranteed for only twenty years, whereas FHA financing on Urcy Belle has a fifty-year life and HUD financing on Glenbrook has a forty-year life. Because the contract rents roughly double the market rate, a prudent buyer of either apartment building would want some assurance on the renewability of the subsidized arrangement. On this the record is sketchy. The general partner in each of the partnerships that owned the respective apartment complexes testified:

> Generally, these are renewed, but there's some negotiation in the 20 years.

> The newer contracts they're writing on these [similar] properties ... in the last two or three years, actually has [sic] a 50–year tie-in, so its the useful life of the property....

In voting to affirm, I indulge the assumption of renewability. To the extent that there is any uncertainty in this regard, it could be expected to influence what a prudent buyer would pay and a seller's assessment of what it had to sell. Moreover, the effect would not await the expiration of the twenty-year contract term because a "knowledgeable" buyer, as the law presumes, *see* Utah Code Ann. § 59–2–102(8), would factor in the uncertainty at whatever time the negotiations occurred. The influence of a federal contract, including agreed rental rates, corresponds directly with the remaining life of such contract. Further, expiration of the contract term short of the anticipated economic life of the assessed property is relevant to value whether the contract rents are *more* or *less* than market rents. In the former, a prudent buyer would ask, How

---

4. The lead opinion misconstrues the thrust and future effect of this requirement endorsed by a majority of the court. Justice Russon poses the question, "But what if expert testimony indicated that consideration of contract rents would distort the fair market value of the property ... ?" The question is ill-put since it assumes that the mere act of considering requires acceptance. The answer to the question is that if after fair consideration it appears that contract rents distort rather than aid the inquiry, then the Commission's factual findings should so reflect.

much longer are the subsidies guaranteed? in the latter, When will the property be set free to command market rates? That which is a value-enhancer in the Richfield market may be a value-depressant in other markets.[5]

The Urcy Bell Apartments were constructed in 1980; the Glenbrook in 1983. The existing contracts will expire respectively in four and seven years. In contrast, the anticipated economic life of the projects will likely continue for some three decades or more. The Commission's appraisals for the years in question were level.[6] Such necessarily assumes an uninterrupted continuation of the stream of income on which the appraisals were premised. This may not accurately project the future, but in the absence of any real treatment by the parties or the Commission, no relief can be given in this appeal.[7]

### C. Conclusion

Since the Commission reached the proper legal conclusion regarding the necessity of considering the federal contracts, the issues focus on the adequacy of its factual findings. I agree with the lead opinion's conclusion that the property owners failed to demonstrate that Sevier County's assessments inadequately addressed the benefits and burdens of the federal contracts which had been properly raised. The actual factual findings are supported by substantial evidence and are entitled to deference. I further agree with the opinion's rejection of a claim of a constitutional violation. That is a correct legal conclusion.

Accordingly, I agree that the Commission's decision should be affirmed.

DURHAM, J., concurs.

---

**5.** If market rents exceed contract rents, value may be compromised according to the number of years that the owner is "locked-in" to the lower rates. The degree of impact would depend upon an analysis of all the benefits and burdens of the federal contract and could be expected to erode as the contract moved toward expiration.

**6.** Urcy Bell was appraised at $750,000 for 1992 and 1993; Glenbrook was appraised at $1,100,00 for 1991, 1992, and 1993.

Having disqualified himself, STEWART, Associate C.J., does not participate herein; McIFF, District Judge, sat.

---

**7.** Though providing no relief for years past, the analysis is relevant to the discharge of the County's ongoing assessment responsibility. It responds to the request for legal guidance which is inherent in the Commission's decision and in the presentations of the parties addressed therein.